Bellacosa, J.
(dissenting). While I concur in the result urged in the dissenting opinion of Judge Smith, I write separately to stress my reasons for voting to affirm the Appellate Division order. This complementary dissenting expression also reflects reasons for joining the Court’s unanimous affirmance in Matter of Mott v Patricia Ann R. (91 NY2d 856 [decided today]).
Drawing on comity and public policy considerations, as well as constitutional and statutory principles, we dissenting Judges *330 are unable to discern a legally cognizable basis to justify the reversal of the Appellate Division order. Within the framework of the petition, record and authorities governing this case, New York should not interpose its adjudicative authority against the competence and efficacy of the Florida court that originally determined, and continues to possess and exert jurisdiction over this custody-visitation dispute (see, Domestic Relations Law § 75-o; Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 75-o, at 349-350; Fla Stat Annot §§ 61.1306, 61.1308, 61.1326; Yurgel v Yurgel, 572 So 2d 1327, 1330 [Fla]).
The PKPA and UCCJA, in conjunction with empirically developed standards designed for reasonable and fair adjudication of familial disputes and for inculcation of public respect for the judicial process, serve an overarching purpose — reasonably definitive noncompetitiveness among the State courts (see, 28 USC § 1738A [Parental Kidnaping Prevention Act]; Domestic Relations Law art 5-A [Uniform Child Custody Jurisdiction Act]; Thompson v Thompson, 484 US 174, 180, 183; Vanneck v Vanneck, 49 NY2d 602, 608; Yurgel v Yurgel, supra, 572 So 2d, at 1330; Restatement [Second] of Conflict of Laws § 79, comment a). These efforts have been mutually agreed upon as disincentives to mitigate against children being used as pawns in contests that entangle litigants and courts amidst powerfully competing legal rights and values.
In Vanneck, for example, this Court explained:
“The UCCJA represents a considered effort to give stability to child custody decrees, minimize jurisdictional competition between sister States, promote co-operation and communication between the courts of different States, all to the end of resolving custody disputes in the best interests of the child” (Vanneck v Vanneck, supra, 49 NY2d, at 608 [citations omitted]).
The long-time Practice Commentator for the New York Domestic Relations Law amplifies in these words:
“[A]s long as the non-custodial parent or any other ‘contestant’ as defined in Section 75-b * * * remains rooted in the original state, that state is entitled to the first crack at modification, and under the PKPA no other state’s court may assume jurisdiction unless and until the original state has declined” (Sobie, Practice Commentaries, McKinney’s Cons Laws *331 of NY, Book 14, Domestic Relations Law § 75-o, at 350).
The applicable statutes, guiding principles and prevailing policies should, therefore, persuade New York courts to forebear the assertion of jurisdiction generally and especially in this case on its objectively analyzed record.
We dissenting voices can appreciate an arguable framework for any State declaiming territorial superiority when horrific facts underlie and surround a terribly dysfunctional situation. On the other hand, emotionally driven circumstances are precisely the kind of subjective features that ought to light caution signals for courts of law invested with the obligation to apply objective legal principles, particularly to hard cases. We wish to underscore, however, that we share the felt human and judicial concern for the welfare and best interests of the children in this case and those who will be governed by its rule from now on.
Juridical discipline is always necessary, but particularly desirable when sympathetic facts interface with what may seem to be coldly analytical processes. Importantly, the role of the courts in implementing the various legislative mandates in these delicately balanced situations and in exercising their parens patriae supervision is principally to render fair and principled decisions to all concerned. That goal, through the instrumentality of the judicial process, provides some measure of definiteness, regularity and consistency, resting on a mutuality of respect for the integrity, competence, compassion and intelligence of sibling States’ judicial systems and protocols, as well New York’s. The Golden Rule, simple as it seems, offers universally useful instruction here because New Yorkers expect a reciprocal respect when the writs and residents of their State are placed in question or jeopardy elsewhere (see, In re Clausen, 442 Mich 648, 691, 502 NW2d 649, 668, stay denied sub nom. DeBoer v DeBoer, 509 US 1301; compare, Johnson v State, 511 So 2d 1333, 1343-1344 [Miss] [Robertson, J., dissenting], revd 486 US 578; see originating case, People v Johnson, 69 NY2d 339).
Against this backdrop, the majority (1) tenders an exigent rationale, (2) declares a new standard of legal neglect dependent on a novel concept of “special vulnerabilities,” and (3) promulgates a ground-breaking precedent. Together, these features decide this case with a New York jurisdictional outreach.
*332 The reasoning and. rule inevitably contradict an inextricable ingredient of the Florida custody-visitation decree. In this respect, we dissenters perceive the direct effect of this case very differently from the majority, that elevates the father’s custody component while devaluing the equally important mother’s visitation rights. The practical consequence of today’s ruling legitimatizes the father’s functional severance of the mother-children’s legal and actual relationship by continued suspension of all visitation and contact rights, obligations and efforts, pending more litigation here and in Florida.
In this significant case, the respondent mother’s lawful conduct in attempting to communicate in New York with her children by phone, letter and visit, in accordance with the patently valid Florida court order, is now transformed by this Court’s decree into a species of legally defined child neglect and psychological assault against her children. Ironically, failure to maintain the parent-child relationship with some contact would ordinarily serve as a basis for adjudging a parent neglectful of a child and might lead to a permanent severance and termination of parental rights (see, e.g., Family Ct Act § 614 [1] [d]).
Concededly, the respondent mother appropriately sought to enforce her visitation rights in accordance with the Florida court’s specifications. Her rights were granted as part of the same Florida decree that gave custody to her former husband. Indeed, the father won his custodial rights from the Florida court and later violated the complementary visitation parts of that same decree. The record shows that he resorts to self-help to bypass licit judicial activity when it does not comport with his interests. He eventually abandoned fully pursuing his rights in the competent courts of Florida and turned instead to the New York courts, where he again lost. At that point, interest was aroused in the local child care agency in Rochester, New York, where the teenagers have resided with the father for many years. The Monroe County Social Services Department entered this family fray and undertook an official interventive responsibility on behalf of the teenagers’ plight. While the agency’s motives and objectivity are not in question, the timing and sequence of its white-knight actions through its special Family Court Act article 10 proceeding check or even checkmate the Florida custody-visitation decrees. The irony is that the father has managed even to juxtapose the judicial processes of two States against one another, while he gains the strategic upper hand in the continuing litigation activity, now *333 through the Rochester Social Services Department’s lateral entry.
Thus, the decision that allows New York courts to assert adjudicative power over this matter in this fashion and on this legal theory and conflicted and frail record also directly confronts the purposes of wisely balanced and comprehensive jurisdictional-comity restraints. The protective perimeter is erected on foundation posts of mutual respect that is supposed to provide a bulwark against any State’s or local agency’s parochialism. Up to now, this has well served as a transcendent, special guardian of the best interests of all children, wherever they may be located (see, Thompson v Thompson, 484 US 174, 177; see also, In re Clausen, 442 Mich 648, 668-669, 502 NW2d 649, 657, stay denied sub nom. DeBoer v DeBoer, 509 US 1301, supra; Care & Protection of Vivian, 420 Mass 879, 884-885, 652 NE2d 616, 619; Note, One Child’s Odyssey Through the Uniform Child Custody Jurisdiction and Parental Kidnaping Prevention Acts, 1993 Wis L Rev 589 [1993] [discussing effects on child in In Interest of A.E.H., 161 Wis 2d 277, 468 NW2d 190]).
For this Court today to countenance this New York party- and court-forum selection in these circumstances produces a disturbing result for the particular case. Of equal importance to the result, the litigation jockeying and the emanating rule should raise concerns about the unsettling paradigm established for countless other cases here, in other States and in all courts (see, Halvey v Halvey, 330 US 610).
The precedential consequences of cases decided on individualized exigency grounds were powerfully described by Justice Robert Jackson in 1944:
“All who observe the work of courts are familiar with what Judge Cardozo described as ‘the tendency of a principle to expand itself to the limit of its logic.’ A military commander may overstep the bounds of constitutionality, and it is an incident. But if we [the United States Supreme Court, or I respectfully submit, the New York Court of Appeals] review and approve, that passing incident becomes the doctrine of the Constitution. There it has a generative power of its own, and all that it creates will be in its own image” (Korematsu v United States, 323 US 214, 246 [Jackson, J., dissenting] [emphasis added]).
*334 It is necessary also to make some reference to the role of the psychological material presented in the instant case. Experts, who predict future consequences based on their professional theories and examinations of subject children, should not be elevated to the singular importance of, in effect, overriding the array of pertinently balanced jurisdictional protections afforded to decrees affecting one of society’s most sacrosanct relationships — parent and child. Courts must beware lest the unique juridical authority to decide these cases be sacrificed to the sheer crosswinds of paid or even so-called independent experts. The authority to decide cases is nondelegable and it invests particular competence of these most sensitive and complicated controversies in a given State with established priorities and precedence. Any competing State presuming to interfere with the force of first instance custody-visitation rulings by another State court or to alter its essential decree bears a huge threshold burden.
Pertinently, the conclusions asserted in the affidavits of the psychologists in this case — limited now to Arash, the only teenager still subject to this proceeding, despite the transfused emphasis placed by the majority on aspects pertaining to Say eh — should not drive the outcome of this inter-State jurisdictional contest. Something more must be presented for New York to triumph, but that something is missing from this record as a matter of law; and no emergency is presented, a feature on which we all seem to agree. Indeed, Judge Smith’s cogent articulation and analysis on all these aspects are compelling.
In sum, the majority’s preference for New York courts over Florida’s charts a new course for this latest litigation trip and many others yet to be encountered. The holding today significantly impairs the comity covenant among the States that ought to be the hallmark of custody determinations. Moreover, the ruling and its precedent may even impinge on and implicate the force of the Full Faith and Credit Clause (see, Matter of R.L.S., 879 P2d 1258, 1266 [Okla]; State in Interest of D.S.K., 792 P2d 118, 130 [Utah]; Care & Protection of Vivian, 420 Mass 879, 884-885, 652 NE2d 616, 619, supra; see also, Johnson v State, 511 So 2d 1333, 1343-1344, revd 486 US 578, supra; compare, People v Johnson, 69 NY2d 339, supra). Finally, the practical consequences of the reversal of the order of the Appellate Division will fuel delay and multiplicity of overlapping and conflicting litigations, and will mar the harmonious face of comity.
*335 Chief Judge Kaye and Judges Titone and Levine concur with Judge Ciparick; Judge Smith dissents and votes to affirm in a separate opinion in which Judges Bellacosa and Wesley concur; Judge Bellacosa dissents in another opinion in which Judges Smith and Wesley also concur.
Order reversed, etc.