OPINION
{¶ 1} The appellant, Anna Canter ("Anna"), appeals the November 18, 2003 judgment of the Common Pleas Court, Juvenile Division, of Union County, Ohio, designating her ex-husband, Appellee Charles Brian Rutan ("Brian"), the residential parent of their son, Charles Franklin Rutan ("Frankie").
 {¶ 2} On November 9, 1988, Frankie's maternal grandparents, Frank and Doreen Snow, filed an application for custody of Frankie, who was twenty-one months old, in the juvenile court of Union County, the county in which they then resided. At the time, Anna and Brian, who were married to one another, consented to custody being placed with the Snows. On December 14, 1988, the juvenile court granted temporary custody of Frankie to the Snows. No other motions were filed within the following year, and, pursuant to Juv.R. 14, the temporary custody order expired. Thereafter, Anna and Brian filed a petition for dissolution in the Common Pleas Court of Union County, Ohio, on May 30, 1990. That court dissolved the marriage between Anna and Brian, and Anna was awarded custody of Frankie pursuant to the parties' agreement. Brian was granted visitation and ordered to pay child support in the amount of $140.00 per month.
 {¶ 3} Throughout the next several years, Anna remained in the area but moved repeatedly. While Frankie lived with her at times, he primarily stayed with his grandparents, who lived in Union County until 1999. During this time, Brian exercised his visitation with Frankie and paid support for him to Anna. In August of 2001, Frankie moved to Houston, Texas, to live with his paternal aunt. He remained in Texas until March of 2003, when he returned to Ohio. Frankie, who was then sixteen, lived with his mother for the next two months while he completed the school year. Anna then moved to Kentucky with her current husband, David Canter, and the Snows took Frankie to West Virginia, where they currently reside.
 {¶ 4} Shortly after Frankie went to West Virginia, Anna decided that she wanted him to come to Kentucky to live with her. Anna called Frankie, and the two argued about him moving to Kentucky. When the call ended, Frankie was upset and crying. The next time Anna called the Snow home, her father told her not to call there again. Thereafter, Anna contacted authorities in Kentucky to pursue criminal charges against her parents for kidnapping Frankie. This resulted in Frank Snow's arrest in West Virginia and felony charges filed against both Frank and Doreen for kidnapping. However, Frank was released from custody shortly after his arrest, and Frankie continued to live in West Virginia with his grandparents.
 {¶ 5} On July 7, 2003, the Snows filed a motion to modify the parental rights and responsibilities of Frankie in the Union County juvenile court. Pursuant to R.C. 3109.27, the Snows also filed an affidavit, providing information regarding the places Frankie lived the previous five years and the divorce proceedings in 1990. Counsel was appointed for Anna based on her indigent status, and she filed a motion for custody and the immediate return of Frankie on September 15, 2003.
 {¶ 6} On September 30, 2003, the Common Pleas Court certified the record in this case to the juvenile court in accordance with R.C. 3109.06, giving the juvenile court exclusive jurisdiction over the matter. Brian then filed his own motion for custody of Frankie, pro se, on October 1, 2003. A hearing was later held in the juvenile court on October 7, 2003. During the hearing, counsel for the Snows orally renewed their motion for modification of the parental rights and responsibilities of Frankie and further requested that the court grant custody of Frankie to the Snows. At the conclusion of the hearing, the juvenile court denied the motions of Anna and the Snows, granted custody of Frankie to Brian, awarded Anna visitation, and ordered her to pay child support. This appeal followed, and Anna now asserts two assignments of error.[1]
 The trial court lacked jurisduciton [sic] to proceed andmake orders in this matter.
 The court's finding that an award of custody to the fater
[sic], appellee Charles Rutan, was in the best interests ofthe child and that mother was unsuitable and had abandoned thechild, was against the manifiest [sic] weight of the evidence.
 First Assignment of Error
 {¶ 7} In her first assignment of error, Anna maintains that the juvenile court did not have jurisdiction in this matter for two reasons. First, she contends that the common pleas court's decision as to Frankie's custody during the divorce proceedings in 1990, was invalid because his custody had previously been determined by the juvenile court in 1988. Second, she asserts that even if the common pleas court's custody determination was valid and it could certify its jurisdiction to another court, it could only certify jurisdiction to a court with proper jurisdiction. Under this theory, she contends that Ohio was not the proper forum but that this matter should have been heard in either Kentucky or West Virginia. For the reasons that follow, we disagree with both assertions.
 {¶ 8} The Revised Code provides that a juvenile court has jurisdiction "to determine the custody of any child not a ward of another court of this state[.]" R.C. 2151.23(A)(2). Thus, under this section, which contained the same material language in 1988, the juvenile court had the authority at that time to determine Frankie's custody. However, pursuant to Juv.R. 14, the juvenile court's grant of temporary custody of Frankie to the Snows expired after one year, December 14, 1989, resulting in custody reverting back to his parents.
 {¶ 9} As previously noted, Brian and Anna initiated dissolution proceedings in 1990. At that time and even today, the court of common pleas had "full equitable powers and jurisdiction appropriate to the determination of all domestic relations matters." R.C. 3105.011. This includes custodial issues of the minor children of the marriage. See. R.C. 3109.04(A). Therefore, contrary to Anna's position, the common pleas court acted well within its subject matter jurisdiction in determining the custody of Frankie during the 1990 dissolution proceedings. However, our discussion does not end there as Anna also contests whether the certification to the juvenile court of Union County, Ohio, was proper.
 {¶ 10} The Revised Code states,
[a]ny court, other than a juvenile court, that hasjurisdiction in any case respecting the allocation of parentalrights and responsibilities for the care of a child undereighteen years of age and the designation of the child's place ofresidence and legal custodian * * * may, on its own motion * * *,with the consent of the juvenile court, certify the record in thecase * * * to the juvenile court for further proceedings[.]
R.C. 3109.06. Once a court certifies the record to the juvenile court, the juvenile court has "exclusive jurisdiction." R.C.3109.06. Thus, when a case involving the allocation of parental rights and responsibilities and the place of residence and legal custodianship of children under age eighteen is certified by another court to the juvenile court, the juvenile court has exclusive jurisdiction over it.
 {¶ 11} As previously noted, in the case sub judice, the Union County Court of Common Pleas obtained jurisdiction over this matter in 1990, when the marriage between Anna and Brian was dissolved. This included making determinations regarding custody, visitation, and support of Frankie, who was only three at the time. Therefore, it had jurisdiction over Frankie's custody until he attained the age of eighteen. See Loetz v. Loetz (1980),63 Ohio St.2d 1, 2. However, in 2003, it certified the record of this case to the juvenile court with the consent of that court. Therefore, the juvenile court of Union County was given exclusive jurisdiction over this case.
 {¶ 12} Having determined that the juvenile court had subject matter jurisdiction over this custody dispute, we must now determine whether the State of Ohio was the proper forum for the dispute at issue rather than another state, as Anna asserts. As noted by the Ohio Supreme Court, a jurisdictional dispute between states may arise when a child is taken to another state. Justisv. Justis (1998), 81 Ohio St.3d 312, 267. When that happens, "[t]he question then becomes which state has the authority to exercise jurisdiction over the matter." Id.
 {¶ 13} In order to resolve these issues and to prevent the repeated removal of children to other states by a parent in order to obtain a more favorable judgment, i.e. forum shopping, "the Uniform Child Custody Jurisdiction Act ("UCCJA") was drafted in 1968 and adopted by Ohio in 1977. See R.C. 3109.21 to 3109.37[.]" Id. This act was designed to provide consistency in jurisdictional determinations among the states when the custody of a child is at issue. In addition, "[t]o bolster the effectiveness of the UCCJA, Congress passed the Parental Kidnapping Prevention Act ("PKPA"), Section 1738A, Title 28, U.S. Code, in 1980, mandating that states afford full faith and credit to valid child custody orders of another state court." Id. at 267-268, citing Thompson v. Thompson (1988), 484 U.S. 174; Demelis, Interstate Child Custody and the Parental Kidnapping Prevention Act: The Continuing Search for a National Standard (1994), 45 Hastings L.J. 1329, 1329-1330.
 {¶ 14} The UCCJA, as it is codified in Ohio, provides that although an Ohio court may have jurisdiction to a make a parenting determination relative to a child in a particular case, that court is not to exercise that jurisdiction unless one of four factors applies. R.C. 3109.22(A). These four factors are:
(1) This state is the home state of the child at the time ofthe commencement of the proceeding, or this state had been thechild's home state within six months before commencement of theproceeding and the child is absent from this state * * *, and aparent * * * continues to live in this state;
 (2) It is in the best interest of the child that a court ofthis state assumes jurisdiction because the child and hisparents, or the child and at least one contestant, have asignificant connection with this state, and there is available inthis state substantial evidence concerning the child's present orfuture care, protection, training, and personal relationships;
 (3)The child is physically present in this state and eitherhas been abandoned * * *;
 (4) It appears that no other state would have jurisdictionunder prerequisites substantially in accordance with division(A)(1), (2), or (3) of this section * * * and it is in the bestinterest of the child that this court assume jurisdiction.
R.C. 3109.22(A). In determining whether this state may properly exercise its jurisdiction, "[p]hysical presence of the child, while desirable, is not a prerequisite for jurisdiction to make a parenting determination relative to the child." R.C. 3109.22(C).
 {¶ 15} A child's home state is defined as "the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as parent, for at least six consecutive months." R.C. 3109.21. In this case, Frankie lived with his grandparents in West Virginia from June of 2003, until the time of the hearing, October 7, 2003, a total of four months. Prior to that time, he lived with his mother in Ohio for two months, March-May of 2003. Before returning to Ohio in March, 2003, Frankie had lived in Texas since August of 2001. Thus, in the six months immediately preceding the first filing in the present dispute, Frankie had not lived in one state. Given these facts in light of the statutory definition of home state, it appears that Frankie did not have a home state at the time the instant proceedings were commenced. Therefore, the application of R.C. 3109.22(A)(1) in this case is not appropriate. However, there remain three other factors to consider in determining whether the juvenile court erred in exercising its jurisdiction.
 {¶ 16} As noted, R.C. 3109.22(A)(2) confers the authority to exercise jurisdiction on an Ohio court if it is in the best interest of the child, if the child and at least one contestant have a significant connection with this state, and if there is substantial evidence available in Ohio concerning the child's present or future care, protection, training, and personal relationships. Here, contrary to assertions made by Anna in her brief to this Court, the evidence revealed that Brian, Frankie's father, lived in Troy, Ohio. Additionally, although Frankie lived with his paternal aunt in Texas for approximately a year and a half prior to returning to Ohio and eventually moved to West Virginia, Frankie lived in Ohio for the first fourteen years of his life. He attended school in Ohio during these years and completed the last two months of the 2002-2003 school year in Ohio. Ohio was also Frankie's home state when custody proceedings were first commenced in the juvenile court in 1988, as well as at the time of his parents' dissolution in 1990. Further, five of the nine witnesses who testified at the modification hearing all lived in Ohio. The other four witnesses who testified were the Snows, Anna, and Frankie, each of whom had lived in Ohio for the majority of Frankie's life.
 {¶ 17} Clearly, Frankie's father, one of the contestant's in this case who was requesting custody of Frankie, had a significant connection to Ohio because he lives in this state. Frankie also had a significant connection to Ohio, having lived and attended school in Ohio most of his life, including the two months prior to the circumstances that gave rise to the motions currently at issue. In addition, two maternal aunts and a great-aunt, all of whom testified at the hearing and all of whom had significant contact with Frankie throughout his life, live in Ohio. Thus, substantial evidence was available in Ohio concerning Frankie's care, protection, training, and personal relationships, all of which was necessary to the determination of whether the previous order should be modified and custody of Frankie awarded to someone other than Anna, particularly his father.
 {¶ 18} Moreover, no other state, namely West Virginia or Kentucky, was more suited to determine Frankie's custody, as he lived in West Virginia for only four months by the time of the hearing and had never lived in Kentucky where his mother had lived for only four months. Therefore, it was in Frankie's best interest that Ohio, the state with the most significant connection to Frankie, exercise its jurisdiction. Accordingly, R.C. 3109.22(A)(2) was applicable in this case, and the juvenile court did not err in exercising its jurisdiction. As such, the first assignment of error is overruled.
Second Assignment of Error
 {¶ 19} Anna next contends that the juvenile court's modification of the prior allocation of parental rights and responsibilities was against the manifest weight of the evidence. The Revised Code states that a "court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree * * * that a change has occurred in the circumstances of the child [or] the child's residential parent[.]" R.C. 3109.04(E)(1)(a). The court must also find "that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a). However, the court shall retainthe residential parent designated by the prior decree * * *unless a modification is in the best interest of the child andone of the following applies: * * * (iii) The harm likely to becaused by a change of environment is outweighed by the advantagesof the change of environment to the child.
R.C. 3109.04(E)(1)(a)(iii).
 {¶ 20} In determining whether a modification of a prior decree is in the best interest of the child at issue, the Revised Code requires the trial court to consider several enumerated factors, as well as any other relevant factors. These factors include, but are not limited to, the following:
(a) The wishes of the child's parents regarding the child'scare;
 (b) If the court has interviewed the child in chamberspursuant to division (B) of this section * * *, the wishes andconcerns of the child, as expressed to the court;
 (c) The child's interaction and interrelationship with thechild's parents, siblings, and any other person who maysignificantly affect the child's best interest;
 (d) The child's adjustment to the child's home, school, andcommunity;
 (e) The mental and physical health of all persons involved inthe situation;
 (f) The parent more likely to honor and facilitatecourt-approved parenting time rights or visitation andcompanionship rights;
 (g) Whether either parent has failed to make all child supportpayments * * * that are required of that parent * * *;
* * *
(j) Whether either parent has established a residence, or isplanning to establish a residence, outside this state.
R.C. 3109.04(F)(1) (a-j).
 {¶ 21} The Ohio Supreme Court has previously held that a decision to modify custody pursuant to this statute will not be disturbed on appeal absent an abuse of discretion. Davis v.Flickinger (1997), 77 Ohio St.3d 415, paragraph one of the syllabus. This standard of review is applied because it is imperative that trial courts are given wide latitude in these cases. Id. at paragraph two of the syllabus. Thus, we will not reverse the decision of the trial court unless the court acted in a manner that was arbitrary, unreasonable, or unconscionable. SeeBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 22} In the case sub judice, the juvenile court found that Anna moved a great deal during Frankie's childhood. This finding was supported by the evidence, which revealed that Anna had no less than ten different addresses since her marriage was dissolved in 1990, including periods where she lived with her parents. In addition, the evidence revealed that Frankie spent a considerable amount of time with his maternal grandparents, who provided him with food, clothing, and shelter. They also took him to school and to visit Brian during Brian's visitation time.
 {¶ 23} The evidence also demonstrated that at one time, Anna lived with Gary Shaw, whose car she took out of town for several weeks without his permission and without leaving Frankie in anyone's care. However, upon discovering that Anna had left town, the Snows took care of Frankie. Further, since her dissolution in 1990, she also lived with Terry Niece, who physically abused her, and Mike Yates. In 1998, Anna married David Canter, her current husband, who was previously convicted of manslaughter. David suffers from bi-polar disorder and receives disability payments from the government because of this disorder, as do Anna and her other son, Eric Niece. However, David recently lost his job, and he and Anna lost their home in Ohio. As a result, in June of 2003, the couple moved to Kentucky to be closer to David's family and the Snows brought Frankie to West Virginia.
 {¶ 24} Prior to that time, she sent Frankie to live with Brian's sister in Texas in August of 2001. Admittedly, she sent him to Texas because he needed stability and an environment where he could prepare for college. Since sending him to Texas in 2001, Frankie lived with Anna for only two months. However, while he was in Texas, Anna flew him back to Ohio for various holidays.
 {¶ 25} In addition to this evidence, Brian testified that in May and June of 2003, Anna repeatedly told him that he could have custody of Frankie as long as she did not have to pay support. However, Brian testified that she changed her mind when he told her that he thought Frankie should live with whomever he wanted because he was old enough to make that decision. Further, Frankie testified that he wanted to live with his grandparents because he felt safe and stable at their home and that he did not feel this way while in his mother's care. He also testified regarding the numerous moves his mother made throughout his life and that he was often with his grandparents.
 {¶ 26} The evidence at the hearing also revealed that Brian always satisfied his support obligation for Frankie, maintained health insurance for his son, and exercised the visitation provided to him in the dissolution. Brian further testified that he is an ironworker in Dayton, Ohio, earning $25.63 per hour for forty hours per week, is married, and has three other children and two stepchildren.
 {¶ 27} Based on the aforementioned evidence, the juvenile court found that a modification of the prior custody decree was in Frankie's best interest because of his need for stability in his life, that there had been a change of circumstances since the original custody decree in 1990, and that the harm likely to be caused by a change of environment was outweighed by the advantages of the change of environment to Frankie. In reviewing the relevant factors to consider, we cannot find that the trial court abused its discretion in modifying the prior decree and designating Brian as the residential parent. Although every aspect of Brian's life and ability to care for Frankie was not introduced into evidence, evidence was presented to show that (1) the critical element missing in Frankie's life was stability, (2) Anna was unable to provide this stability, and (3) Frankie would have a stable home with Brian. Therefore, the second assignment of error is overruled.
 {¶ 28} For these reasons, the judgment of the Common Pleas Court, Juvenile Division, of Union County, Ohio, is affirmed.
Judgment affirmed.
 Cupp and Rogers, JJ., concur.
[1] Although the motion of the Snows for custody of Frankie was overruled, they have not appealed that decision to this Court.