Jessica BEAUREGARD

v.

Grady Samuel WHITE.

No. 2004–242–M.P.

Supreme Court of Rhode Island.

June 19, 2009.

Lauren E. Jones, Esq., Providence, for Plaintiff.

Barry J. Kusinitz, Esq., for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

**OPINION**

Justice FLAHERTY, for the Court.

After she filed for divorce in the state of North Carolina, where she lived with her husband and two children, the plaintiff, Jessica Beauregard, returned to her native state of Rhode Island. In a child-custody determination, a North Carolina judge ordered her to move back to that state with her children or lose physical custody to her husband. The plaintiff then sought and obtained relief in Family Court. The defendant father, Grady Samuel White, now looks to this Court for relief from several Family Court orders that were issued pursuant to the Family Court's exercise of emergency jurisdiction under the former Uniform Child Custody Jurisdiction Act (UCCJA), G.L. 1956 § 15–14–4(a)(3)(ii) (repealed by P.L. 2003, ch. 307, § 1, effective July 17, 2003), and the later adopted Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), G.L. 1956 § 15–14.1–16. This case came before the Supreme Court for oral argument on March 30, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this petition

for certiorari should not summarily be decided. After hearing the parties' arguments and considering the memoranda submitted by counsel, we are satisfied that cause has not been shown. · Accordingly, we will decide the appeal at this time. For the reasons set forth in this opinion, we quash the orders of the Family Court.

## Facts and Procedural History

On May 16, 2000, plaintiff, Jessica Beauregard, filed a complaint for divorce in North Carolina seeking, in addition to other relief, custody of the parties' two children, Colby, born August 10, 1997, and Nicholas, born August 28, 1999. In her complaint, she alleged that both she and her husband had been residents of North Carolina for a period in excess of six months. She claimed that White spent an excessive amount of time on the Internet, that he downloaded pornographic images of men, and that he would not spend time with her or their children. Immediately after filing the complaint, Beauregard moved with the couple's two children to Rhode Island, where her parents resided.

In June 2000, the North Carolina General Court of Justice, District Court Division, held a hearing on temporary custody, ·and on August 3, 2000, it issued an order finding that North Carolina had jurisdiction over the dispute and that it was the home state of the minor children.[1] The court awarded Beauregard temporary custody of both children and it ordered that White could visit with the children in Rhode Island three days each month and that they would visit with him in North Carolina one week per month.

On August 3, 2000, plaintiff filed a motion in North Carolina seeking to terminate her husband's right of visitation. In her motion, she alleged that·there was a substantial change in circumstances because she said that she had learned that White had shaken one of their children. She said that in July 2000, two-and-a-half year-old Colby told his maternal grandmother that his father had shaken his baby brother, Nicholas. Beauregard further alleged that she took Colby to a child psychologist in Rhode Island, Brian Hayden, Ph.D., and the young boy told the psychologist that his father was mean and that he shook Nicholas when he cried. She said that the psychologist referred Nicholas to Hasbro Children's Hospital for a CT scan, and that after questioning Colby, a physician at that facility referred the matter to the Rhode Island Department of Children, Youth and Families (DCYF) for an investigation into whether White had engaged in excessive and inappropriate discipline.

On September 6, 2000, in response to the allegation that defendant had abused Colby, the North Carolina court issued an order requiring defendant's visitation with the children to be supervised. The supervision requirement remained in effect for approximately two months, but it eventually was vacated. Meanwhile, as a result of the DCYF investigation, White initially was indicated for excessive and inappropriate discipline of his son Nicholas; however, DCYF declined to pursue legal action because the event occurred in North Carolina. White nonetheless filed an administrative appeal in Rhode Island, and in June 2001, after reviewing the evidence, a DCYF hearing officer determined that the

1. Section 28 U.S.C. § 1738A(b)(4), enacted as part of the Parental Kidnapping Prevention Act (PKPA), provides that the "home state" is "the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons."

claim of excessive and inappropriate discipline was "unfounded."

In December 2000, an altercation involving the parties and Beauregard's parents occurred at the office of Dr. Hayden. As a result, on December 13, 2000, Beauregard filed a complaint for protection from abuse in Rhode Island. A magistrate for the Family Court presided over the matter, and on February 20, 2001, judgment was entered granting plaintiff's complaint by consent of the parties. By agreement, the court's order provided that visitation should continue as previously ordered by the North Carolina court, and the Family Court entered the order without making any findings of fact. On or about March 7, 2001, the North Carolina judge spoke with the magistrate on the telephone. In a memorandum memorializing their conversation, the North Carolina judge indicated that the magistrate said that Beauregard and her parents had acted in an "unreasonable" manner.

Although the parties were granted a divorce in September 2001, it was not until July 2002 that the North Carolina court held hearings on the custody issues raised in Beauregard's divorce complaint. On November 26, 2002, the North Carolina court entered an order pertaining to its child-custody determination. In that order, the North Carolina judge found that White repeatedly had used the Internet to view male pornography, which prevented him from interacting with his children. With respect to custody, the judge ruled that North Carolina was the home state of the children, and that he was entering an "initial child custody determination." The judge found that although Beauregard had valid reasons for moving to Rhode Island, he also believed that she had tried to "squeeze" the father out of their children's lives. The judge concluded that the children still had strong ties to North Carolina. Noting the altercation that occurred outside Dr. Hayden's office, he concluded it was a harbinger that Beauregard would create problems and hinder White's visitation if she and the children remained in Rhode Island. He found that the children would benefit from a strong relationship with their father, and if they lived in Rhode Island it would become more difficult to maintain the previously set visitation schedule as they matured. He also found that Beauregard's inability to get along with White hindered White's ability to preserve a relationship with his children. The judge, therefore, ruled that it was in the best interests of the children that they and their mother move back to Mecklenburg County, North Carolina (the Charlotte area), by December 2002. The judge awarded joint legal custody to the parties, with Beauregard having primary physical custody. However, the judge further ordered that if plaintiff chose not to move to Mecklenburg County, North Carolina, with the children, they would then reside with White.

It is significant that on September 12, 2002, more than two months before the order was entered in the record, the North Carolina judge had written a memorandum to the parties' attorneys setting forth what the terms of the order would be. On October 31, 2002, in an apparent effort to avoid compliance with what she believed to be onerous provisions in the forthcoming order, plaintiff filed a complaint in the Rhode Island Family Court, seeking to modify the North Carolina custody decision and further seeking emergency relief from the visitation and relocation provisions of the North Carolina order. In her complaint, Beauregard alleged a change in circumstances; she said that she had taken the children for an assessment with John Parsons, Ph.D., a psychologist who had expressed concerns that transitioning the children to North Carolina would be detri-

mental to them. She also alleged that she feared for her children's safety, that White had threatened her with physical harm in the past, and that there was an outstanding order of protection from abuse from the Rhode Island court.

That very day, a trial justice of the Family Court issued an *ex parte* order, asserting the Family Court's jurisdiction over the children. The court enjoined the parties from removing the children from Rhode Island without the court's permission, and it ordered that a hearing be held on November 18, 2002. On November 19, 2002, Beauregard supplemented her complaint with a report that Dr. Parsons prepared. The report indicated there was evidence that White was involved extensively with male pornography while the children were in the home, that the children had reported physical abuse by him, and that Beauregard had reported that White physically assaulted her while the children were present.

Based on Beauregard's complaint and Dr. Parsons's report, a general magistrate presiding in Family Court on November 20, 2002, issued another *ex parte* order invoking jurisdiction and finding the circumstances to constitute "an emergency pursuant to the PKPA and the UCCJA." Because Beauregard had experienced difficulty effecting service on White, the court continued the matter to February 4, 2003. The magistrate ordered plaintiff to contin-ue in her efforts to serve the complaint on White. On February 12, 2003, the court issued another order after it determined that Beauregard still had not been able to serve White. The court found that it continued to be in the children's best interest to stay with Beauregard in Rhode Island and it ordered that its previous orders would stay in full force and effect.

On February 27, 2003, White's attorney sent a certified copy of the North Carolina order to Rhode Island, seeking to register the North Carolina court's November 26, 2002 child-custody order.[2] On March 6, 2003, White filed a special entry of appearance in the Rhode Island Family Court, contesting the Family Court's jurisdiction under the UCCJEA and the PKPA. Contemporaneously, he also filed motions in North Carolina, in which he requested that that court hold plaintiff in contempt for failing to abide by that court's orders. On March 11, 2003, after a hearing, the North Carolina court found that Beauregard had failed to move to North Carolina by December 20, 2002, as she had been ordered, and that she had failed to deliver the children to defendant by that date. The North Carolina court again asserted its jurisdiction over the subject matter of the dispute and the parties, and it ordered that the children be placed with defendant. The same day, the court also issued an order finding plaintiff in criminal contempt of court and ordered that she be placed under arrest.[3]

**2.** General Laws 1956 § 15–14.1–27 sets forth provisions for registering a child-custody determination of another state under the UCCJEA. The statute provides that a foreign child-custody determination may be registered with a request that it be enforced in Rhode Island upon filing certain documents with the court. Section 15–14.1–27(a). Upon receipt of the documents, the Rhode Island court "shall * * * [c]ause the determination to be filed as a foreign judgment" and serve notice on the necessary parties. Section 15–14.1–27(b). The parties then are al-lowed twenty days to contest the validity of the registered judgment. Section 15–14.1–27(d). In this case, on March 18, 2003, Beauregard filed an objection to the registration, and a hearing was scheduled for April 17, 2003. The docket in this case reflects that the hearing was continued, and it does not appear that further action was taken upon White's request for registration.

**3.** Certified copies of these North Carolina orders were filed with the Family Court on September 17, 2003.

On September 17, 2003, White filed a motion to dismiss plaintiff's Family Court complaint to modify custody. He argued that North Carolina had made an initial child-custody determination and that that state retained exclusive jurisdiction over custody issues, and therefore, North Carolina was the only state that could modify the custody decree.[4]

The Family Court entertained White's motion to dismiss on November 5, 2003. At that time, the court also permitted Beauregard to present witnesses to support her complaint. Beauregard testified that her children would become upset both before and after they visited with their father. She said that after speaking on the telephone with their father, Colby would cry and yell and Nicholas would become withdrawn. She described the earlier confrontation at Dr. Hayden's office, and said that White had kicked her. She also attested to Colby's complaints that his father had shaken his brother, Nicholas. She reported that the North Carolina court had evidence that defendant had viewed child pornography.

Doctor Parsons also testified at the hearing. He said that transitioning the children to North Carolina would cause them irreparable harm. He said that his concern that there was an emergency situation arose because the children reported physical abuse. Specifically, he testified that Colby had reported to him that his father had shaken his brother. Doctor Parsons also testified that Colby told him that his father was a "tough guy," and that the child said that he needed to protect his brother. Doctor Parsons noted that the children said they were afraid of their father. He also expressed concern about

White's "apparent pedophilias" and the "pornography issue."

On January 29, 2004, the general magistrate rendered a bench decision denying White's motion to dismiss.[5] In his decision, the magistrate reviewed Dr. Parsons's testimony, characterizing it as uncontradicted. He considered Dr. Parsons's findings regarding the children's fear of their father and the reported shaking of the younger son. The court held that the situation was of an emergency nature for two reasons: "The alleged abuse of the child" and "[t]he apparent pedophilia of the [d]efendant as to the safety of the children." In an order dated July 1, 2004, the court asserted that it had temporary emergency jurisdiction under UCCJEA § 15–14.1–16, and it ordered each of the parties to submit to comprehensive psychological assessments and toxicology screens. The order also required defendant to take parenting classes and to submit to a sexual deviancy evaluation. The order provided that "until the present crisis is resolved," defendant would be allowed supervised visits with his children. Notably absent from the order was any indication of how long the order would be in effect or any future date for the parties to appear before the court.

White sought review of the Family Court orders from this Court by way of a petition for certiorari, which we granted. To support his petition, White argues that the Family Court improperly exercised emergency jurisdiction under the UCCJEA. He maintains that the Family Court erred when it failed to limit the term of the temporary emergency order,

4. With the motion, defendant attached copies of Beauregard's complaint for divorce and her motion to terminate visitation that she had filed in North Carolina.

5. The court's decision was not embodied in an order until July 1, 2004, because the parties could not agree on the content of the proposed order.

and, as a result, it improperly modified the North Carolina court order by issuing an order having an indefinite duration. He also submits that the Family Court magistrate erred when he failed to communicate with the North Carolina court, when he improperly founded emergency jurisdiction on events already considered by the North Carolina court, and when he failed to decline jurisdiction because of the "unjustifiable conduct" on the part of Beauregard. Conversely, Beauregard argues that the Family Court properly exercised temporary emergency jurisdiction pursuant to the UCCJA, and that the order was of appropriate limited duration. Beauregard questions the propriety of North Carolina's continuing exercise of jurisdiction after she and her children lawfully moved to Rhode Island, where they had resided for more than two and a half years at the time the North Carolina court issued its custody decision.

## Analysis

The central issue before this Court is whether the Family Court properly exercised jurisdiction to issue the court orders pertaining to the custody of the parties' two children after a child-custody proceeding was ongoing in North Carolina and after the court in North Carolina had made a child-custody determination. We hold that the Family Court's invocation of emergency jurisdiction was proper initially, but thereafter, the allegations were insufficient to continue emergency jurisdiction. We further hold that the Family Court erred when it exceeded its authority

by exercising jurisdiction over the subject matter of plaintiff's complaint.

## I

### Jurisdiction

■ The authority of the Family Court over child-custody disputes is a question of subject-matter jurisdiction. *Jordan v. Jordan*, 586 A.2d 1080, 1083 (R.I.1991). Whether the Family Court has jurisdiction over a claim is a question of law that we review *de novo*. *State v. Sivo*, 925 A.2d 901, 916 (R.I.2007). In Rhode Island, subject-matter jurisdiction of child-custody disputes is now set forth in the UCCJEA, which provides rules for determining the proper forum in child-custody proceedings that involve jurisdictional conflicts. But before the General Assembly adopted the UCCJEA in 2003, the UCCJA was the statutory vehicle for avoiding jurisdictional competition and conflict with other state courts in matters of child custody. *Glynn v. Meslin*, 532 A.2d 554, 555 (R.I.1987).

■ By its very nature, temporary emergency jurisdiction exists only for a limited period. It continues "only for as long as the emergency exists or until a court that has jurisdiction to enter or modify a permanent custody order is apprised of the situation and accepts responsibility." *Nadeau v. Nadeau*, 716 A.2d 717, 725 (R.I. 1998). The drafters of the UCCJEA sought to clarify, among other things, the temporary nature of emergency jurisdiction, and the new act specified certain limitations and procedures for invoking and exercising emergency jurisdiction.[6]

6. The UCCJEA provides that the court has "temporary emergency jurisdiction" if "the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."

Section 15–14.1–16(a). Section 15–14.1–16(c) further provides that:

"If there is a previous child custody determination that is entitled to be enforced under this chapter, or a child custody proceeding has been commenced in a court of a state having jurisdiction, any order issued

Even under the former legislation, the UCCJA, however, this Court consistently had held that emergency jurisdiction is temporary in nature and permits only temporary orders. *Ogden v. Rath*, 755 A.2d 795, 798 (R.I.2000); *Nadeau*, 716 A.2d at 723–24.

After Beauregard filed her complaint in the Family Court on October 31, 2002, the court asserted its emergency jurisdiction under the UCCJA, § 15–14–4(a)(3), the law that then was in effect. Section 15–14–4(a)(3) conferred emergency jurisdiction, only when "the child is physically present in Rhode Island and: (i)[t]he child has been abandoned, or (ii)[i]t is necessary in an emergency to protect the child because he or she has been subjected to or threatened with mistreatment or abuse * * *." On January 29, 2004, after the hearing on Beauregard's complaint, the trial justice exercised emergency jurisdiction under the new UCCJEA, § 15–14.1–16. But, under that law, when a request for relief is made in a child-custody proceeding that had commenced before July 17, 2003, the proceeding is governed by the law in effect at the time the request was made. Section 15–14.1–42.[7] Accordingly, because Beauregard filed her complaint before July 2003, we analyze whether the Family Court properly claimed jurisdiction under the former statute, the UCCJA. Although the old statute is somewhat less specific and less stringent with respect to the temporal limits of emergency jurisdiction, in light of this Court's consistent interpretation of emergency jurisdiction, we believe the analysis of the issues we address in this case would yield the same result under either version of the act.

### A

### The Distinction between Having and Exercising Jurisdiction

■ When considering questions of jurisdiction under the UCCJA, we distinguish between whether jurisdiction exists and whether it should be exercised. *See Jordan*, 586 A.2d at 1084; *Glynn*, 532 A.2d at 556. In *Jordan*, this Court considered whether the Family Court's initial claim of jurisdiction was proper under the UCCJA when the children were physically located in Rhode Island and the father made allegations that his children were subject to physical and emotional abuse by their mother in Florida. *Jordan*, 586 A.2d at 1083. The parties had been granted a divorce in Florida, and the Florida court had reserved jurisdiction to determine child custody at the time the Family Court claimed jurisdiction. *Id.* at 1080–81. This Court held that although the Family Court properly could have entertained jurisdiction under the emergency provision of the

by a court of this state under this section must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction. The order issued in this state remains in effect until an order is obtained from the other state within the period specified or the period expires."

If the Rhode Island court learns that a child-custody proceeding has been commenced or a child-custody determination has been made by a court of another state having jurisdiction, the Rhode Island court "shall immediately communicate with the court of that state to resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order." Section 15–14.1–16(d).

7. Section 15–14.1–42, entitled "Transitional provision" provides:

"a motion or other request for relief made in a child custody proceeding or to enforce a child custody determination which was commenced before the effective date of this chapter [July 17, 2003] is governed by the law in effect at the time the motion or other request was made."

UCCJA, it improperly exercised jurisdiction. *Id.* at 1084–85. We reasoned that § 15–14–7 of the UCCJA precluded the Family Court from exercising jurisdiction. *Jordan*, 586 A.2d at 1084. That section provided that the court

"shall not exercise its jurisdiction under this chapter if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this chapter, unless the proceeding is stayed by the court of the other state because Rhode Island is a more appropriate forum or for other reasons." Section 15–14–7(a).

This Court held that the Florida court had properly exercised jurisdiction and that it was improper for Rhode Island also to exercise jurisdiction, thereby creating the type of jurisdictional conflict the UCCJA was enacted to avoid. *Jordan*, 586 A.2d at 1084.

## B

### Emergency Jurisdiction

Emergency jurisdiction is reserved for extraordinary circumstances, and it is not authorized based on mere allegations that the transfer of custody to the petitioning parent would be in the best interest or welfare of the child. *Glynn*, 532 A.2d at 555–56. Rather, the parent has the burden of showing the existence of a bona fide emergency that constitutes the likelihood of substantial harm to the child, and a parent's self-serving statements are not sufficient to confer jurisdiction. *Id.*

In *Silva v. Tucker*, 500 A.2d 947, 949–50 (R.I.1985), this Court affirmed a temporary custody order issued by the Family Court under the UCCJA, § 15–14–4(a)(3)(ii), holding that the court properly acted on an emergency basis. In that case, the mother filed a complaint in the Family Court, together with affidavits submitted by both mother and son, alleging that the father had physically abused the son. *Silva*, 500 A.2d at 948. The case immediately was heard as an emergency matter, and the child, in an interview with the judge, disclosed that he was afraid to return to his father because of several incidents of physical abuse. *Id.* These included an incident in which the father had picked him up by the shirt and "jacked" him against the wall, and another, three to four months earlier, in which the father picked him up by the head, threw him around, and struck him with a karate-chop blow. *Id.* This Court held that "[w]hen issuing a temporary emergency order, the court is not required to investigate the existence of other jurisdictional factors mentioned in § 15–14–4, nor must it apply other provisions such as § 15–14–7 (simultaneous procedures in other states) or § 15–14–9 (jurisdiction by reason of conduct). This in-depth inquiry is carried out after a full hearing * * *." *Silva*, 500 A.2d at 949.

Likewise, in *Duffy v. Reeves*, 619 A.2d 1094 (R.I.1993), we held that the assumption of emergency jurisdiction was proper because there was sufficient evidence of abuse to schedule the case for a full evidentiary hearing. *Id.* at 1097. In that case, we noted that the trial justice had "more than simply parental allegations on which to base her decision." *Id.* The Family Court had issued an emergency *ex parte* order granting the father temporary custody based on the father's complaint and affidavits submitted by both the father and child. *Id.* at 1095. The affidavits divulged that the child was afraid to return to New York because he feared beatings by his stepfather. *Id.* The child also testified at a hearing that his stepfather had spanked him several times, that it felt like a donkey had hit him when he did so,

and that the stepfather had threatened to beat him with a belt and break his prized hockey stick. *Id.* at 1095–96.

■ In the case before us, as an initial matter and to satisfy the requirement for exercising emergency jurisdiction, the Family Court was required to find only that the children were present in Rhode Island and that there was an allegation of actual or threatened mistreatment or abuse. *See Silva,* 500 A.2d at 949. It was readily apparent that the children had been present in Rhode Island since May 2000. In her complaint, Beauregard alleged that there was an outstanding order for protection from abuse, that White had threatened harm in the past, and that she was concerned for her children's safety because of the actions of their "hostile" father. She further said that a doctor would be filing a report outlining his concerns. Beauregard then submitted a report from Dr. Parsons. That report summarized the psychologist's interviews with the children and concluded that relocating the children to North Carolina could result in irreparable harm to them. Specifically, Dr. Parsons reported that Nicholas and Colby had said that their father was "mean." Colby told Parsons that his father hit him sometimes and that he shook Nicholas one time. Colby also talked about protecting his brother from his father. The report said that Beauregard complained that White had physically abused her and had assaulted her at Dr. Hayden's office. It said that before she left him, Beauregard had found pictures on the Internet that White had downloaded involving males, who she believed to be young boys, performing sexual acts.

It is clear that the allegations in Beauregard's complaint are not nearly as concrete and substantial as those in *Silva* and *Duffy.* However, once Beauregard submitted the psychologist's report, the concerns for abuse became more than "simply parental allegations." *Duffy,* 619 A.2d at 1097. Therefore, under the circumstances of this case, it is our opinion that the allegations were sufficient for the Family Court initially to assert emergency jurisdiction to set the matter down for a hearing. We believe the court acted properly and within its discretion to temporarily retain the matter and enter an interim custody order to protect the children and to schedule a hearing. *See In re C.T.,* 100 Cal.App.4th 101, 121 Cal.Rptr.2d 897, 903–04 (2002) (the finding of an emergency should be made after a full and fair hearing and the court should require evidence on the issue of abuse to determine whether emergency jurisdiction is proper).

■ "Emergency jurisdiction confers authority to make temporary orders, including temporary custody for a limited period of time, pending proceedings in the state with regular jurisdiction under the Act." *Ogden,* 755 A.2d at 798 (quoting *Nadeau,* 716 A.2d at 723–24). The hearing magistrate's initial order scheduled a hearing to be held within twenty days, and it only temporarily enjoined the removal of the children from Rhode Island. The order therefore was appropriately limited in time and scope. The next order, issued on November 20, 2002, likewise was limited in time and scope because it merely allowed Beauregard more time to serve White, and it ordered a hearing for February 4, 2003. Therefore, we cannot say that the Family Court's first two orders exceeded the court's authority. However, we hold that the Family Court erred when it issued its subsequent orders in this case.

## C

## The Allegations were Insufficient to Continue Emergency Jurisdiction

■ After it received a certified copy of the North Carolina child-custody decree

on February 28, 2003, and especially after the hearing on November 5, 2003, it should have been apparent to the Family Court that it should not have continued to exercise emergency jurisdiction. This is so because the testimony given by Beauregard and Dr. Parsons was insufficient to justify continued jurisdiction. In *Woods v. Winsor*, 637 A.2d 373, 374 (R.I.1994), this Court held that the Family Court's finding of no emergency under the UCCJA, § 15–14–4(a)(3)(ii), was proper when the facts behind the allegations of abuse already had been considered and litigated in Kentucky, the state that previously had issued a custody decree. There, the mother had filed a petition in Kentucky seeking to prevent the father's visitation with the child, and she had made allegations that the father had sexually abused the child. *Woods*, 637 A.2d at 374 & n. 1. At the hearing before the Family Court, the trial justice did not admit evidence about abuse that had occurred prior to the Kentucky court's decision, because the Kentucky judge had found that those allegations were "simply another ploy" to deny visitation. *Id.* at 374. We held that Kentucky had jurisdiction over the case and had the authority to issue the custody order. *Id.* Consequently, we decided that Kentucky's order was entitled to full faith and credit. *Id.*

Here, after the hearing on November 5, 2003, the general magistrate gave a bench decision in which he ruled that there were sufficient allegations for emergency jurisdiction to continue. He found that the allegations of abuse and the "apparent pedophilia" justified the court's exercise of jurisdiction. However, our review of the record reveals that the allegations of pedophilia and child pornography were com-

pletely unsubstantiated,[8] and all the allegations of mistreatment and abuse, including the alleged shaking and the circumstances surrounding the order for protection from abuse, were offered in the North Carolina court and were considered and discounted by the judge before that judicial officer gave his decision. To illustrate, the judge took note of the tumultuous event that occurred outside Dr. Hayden's office, and he considered it when he determined that plaintiff likely would make it difficult for the father to visit the children in Rhode Island. Furthermore, in August 2000, the North Carolina court considered the allegations that White shook Nicholas when Beauregard attempted to terminate visitation, and those allegations again were considered by the judge when he made his child-custody determination. It is significant to us that in June 2001, DCYF found that the allegations of abuse by the father had not been substantiated. With respect to the allegations about White's use of the Internet for male pornography, the North Carolina judge expressly considered that when he made his custody determination. Therefore, in our opinion, it was improper for the Family Court to continue to exercise emergency jurisdiction in the absence of any new allegation that, if proven, would reveal the presence of a real emergency because of mistreatment or abuse.

A review of the testimony from the hearing reveals that there were no other allegations of mistreatment or abuse, other than those that already had been considered by the North Carolina court. Although Parsons, the psychologist, concluded that it was not in the children's best interest to move to North Carolina and that relocating them to that state "may in fact result in irreparable harm," these cir-

---

**8.** The allegations that defendant viewed child pornography or that he had "apparent pedophilia" were not supported by any affidavit or testimony other than the mother's mere assertions and the repeated hearsay by Dr. Parsons.

cumstances do not rise to the level of a real emergency creating substantial harm from actual or threatened mistreatment or abuse. *See In re M.M.*, 222 Ga.App. 313, 474 S.E.2d .53, 55 (1996) ("the possibility that the child's well-being 'may be' detrimentally affected by a certain condition is not sufficient to support the exercise of emergency jurisdiction"). It is clear to us that the circumstances here did not present a real emergency, especially considering that so much time had passed, and Beauregard had had ample time to bring her concerns to the attention of the North Carolina court.

▆▆▆▆▆ Furthermore, even if the hearing magistrate had been correct in continuing to exercise emergency jurisdiction, in our opinion, his order was impermissibly broad in scope. Emergency jurisdiction under the UCCJA only confers authority to make temporary orders. *Nadeau*, 716 A.2d at 723–24. Emergency jurisdiction does not authorize courts to make permanent custody orders. *In re A.L.H.*, 160 Vt. 410, 630 A.2d 1288, 1291 (1993). Nor does emergency jurisdiction authorize jurisdiction to modify the custody decree of a court with continuing jurisdiction. *Trader v. Darrow*, 630 A.2d 634, 639 (Del.1993). The plaintiff argues that the Family Court order, entered on January 4, 2004, was temporary because it lasted only until defendant complied with its mandates. In other words, White may have been handcuffed, but he possessed the keys. But,

the order contains no language indicating that it was temporary in nature; rather, it was indeterminate and therefore inappropriate.

**D**

### Without Emergency Jurisdiction, the Family Court Exceeded its Authority in Exercising Jurisdiction

▆▆▆▆▆ In the absence of factors justifying the continuation of emergency jurisdiction, the Family Court should have declined jurisdiction in this case because a child-custody proceeding already was pending in North Carolina when Beauregard filed her complaint in Rhode Island. *See* § 15–14–7(a) ("Simultaneous proceedings in other states"); *Jordan*, 586 A.2d at 1084–85.[9] Further, the continuing jurisdiction of a sister state is not affected by the child's residence in another state for six months or more. *Trader*, 630 A.2d at 637.

At the time Beauregard filed her complaint in Rhode Island, a child-custody proceeding was pending in North Carolina because she had filed her complaint for divorce and child custody there. *See* § 15–14–3(3) (defining custody proceeding to include an action for divorce where a custody determination is one of the issues). It should have been clear to the Family Court that North Carolina was acting in accordance with the UCCJA because it was the "home state" of the children at the time Beauregard filed for divorce and no

9. The UCCJA also requires that "[i]f the court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction, it shall stay the proceeding and communicate with the court in which the other preceding is pending * * *." G.L. 1956 § 15–14–7(c). The UCCJEA now provides that:

"If the court determined that a child custody proceeding has been commenced in a

court in another state having jurisdiction substantially in accordance with this chapter, the court of this state shall stay its proceeding and communicate with the court of the other state. If the court of the state having jurisdiction substantially in accordance with this chapter does not determine that the court of this state is a more appropriate forum, the court of this state shall dismiss the proceeding." Section 15–14.1–18(b).

other state had jurisdiction at the time. Therefore, after the magistrate learned of the North Carolina proceeding and because he was armed with enough information to determine that North Carolina properly had exercised jurisdiction, and also that that state had not stayed or terminated its jurisdiction, the court should not have exercised jurisdiction. To comply with the dictates of the UCCJA, the court should have stayed the proceedings in connection with Beauregard's complaint and communicated with the court in North Carolina "to the end that the issue may be litigated in the more appropriate forum." Section 15–14–7(c).

## E

### North Carolina has Continuing Jurisdiction under the PKPA

■ A state court's custody determination that is consistent with the PKPA is entitled to full faith and credit if the court has jurisdiction under the law of its state and the state was the child's home state when proceedings were commenced. 28 U.S.C. § 1738A(a), (c). Furthermore, the jurisdiction of a state that has made a child-custody determination consistent with the PKPA continues as long as the state has jurisdiction and the state remains the residence of the child or of any contestant. 28 U.S.C. § 1738A(d), (c)(1). Therefore, a state may not modify a child-custody determination of a court of another state, unless the other state no longer has jurisdiction or if it has declined jurisdiction. 28 U.S.C. § 1738A(f).

■ The PKPA "imposes a duty on the States to enforce a child custody determi-

nation entered by a court of a sister State if the determination is consistent with the provisions of the Act." *Thompson v. Thompson*, 484 U.S. 174, 175–76, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988); *see also* 28 U.S.C. § 1738A(a).[10] "Once a State exercises jurisdiction consistently with the provisions of the Act, no other State may exercise concurrent jurisdiction over the custody dispute, § 1738A(g), even if it would have been empowered to take jurisdiction in the first instance * * *." *Thompson*, 484 U.S. at 177, 108 S.Ct. 513.

After a review of the record in this case and of the applicable law, we can come to no other conclusion than that the North Carolina custody determination was entitled to be afforded full faith and credit by the Family Court. We so hold because North Carolina was the home state of the children at the time Beauregard filed for custody in North Carolina and because the North Carolina court made a child-custody determination consistent with the PKPA. Moreover, North Carolina's jurisdiction over the subject matter of Beauregard's complaint continues because White remains a resident of North Carolina, and the courts of that state have not declined jurisdiction.

We take this opportunity to express our grave concerns that this case has languished in a judicial morass for many years, and, as a result, we realize that the children now may have substantial ties to Rhode Island and little, if any, connection to North Carolina. The distressing record in this case reveals that the plaintiff filed her complaint for emergency relief on October 31, 2002. The defendant sent a cer-

---

10. The PKPA was Congress's response to the need for a national uniform standard for enforcing child-custody orders, and it was enacted to "avoid jurisdictional competition and conflict between State courts." *Thompson v.*

*Thompson*, 484 U.S. 174, 177, 181, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). This need arose after several states had adopted modified versions of the UCCJA or had declined adoption. *Id.*

tified copy of the North Carolina custody order to the Family Court on February 27, 2003, and he filed a special appearance contesting jurisdiction on March 6, 2003. However, the defendant did not move to dismiss the plaintiff's complaint until September 17, 2003. The Family Court heard the matter on November 5, 2003, but no decision was given until January 29, 2004, and no written order was entered until July 1, 2004, because the parties could not agree on the language of the order. The record is replete with continuances, no less than five of which were by agreement of the parties. In our opinion, the lapse of nearly two years to complete a case that was both cast as an emergency and was one in which the authority of the court to hear the case was challenged, while two young lives hung in the balance, is simply inexcusable. Nonetheless, we cannot shy away from our duty to enforce the custody decree of a sister state.

## Conclusion

For the reasons stated above, we quash the orders of the Family Court. We remand and order the Family Court to dismiss the plaintiff's Rhode Island complaint. The court is further instructed to order the plaintiff to comply with the orders of the North Carolina court or to obtain relief therefrom within thirty days. The record shall be remanded to the Family Court with our decision endorsed thereon.