IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

JANUARY 2019 TERM

_____

No. 18-0355

_____

**FILED**

**May 31, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE J.C.

_____

Appeal from the Circuit Court of Mercer County
Honorable Derek Swope, Judge
Case No. 17-JA-211

REVERSED AND REMANDED

_____

Submitted: May 14, 2019
Filed: May 31, 2019

Gerald R. Linkous, Esq.
Mercer County Public Defender
Princeton, West Virginia
Attorney for Petitioner A.B.-C.

Andrew T. Waight, Esq.
Childlaw Services, Inc.
Princeton, West Virginia
Shannon L. Baldwin, Esq.
Baldwin Law Office PLLC
Bluefield, West Virginia
Guardians ad Litem for J.C.

Patrick Morrisey, Esq.
Attorney General
Brandolyn N. Felton-Ernest, Esq.
Assistant Attorney General
Attorneys for Respondent
Department of Health and Human
Resources

JUSTICE HUTCHISON delivered the Opinion of the Court.

1. "Subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, West Virginia Code § 48–20–101, *et seq.*, cannot be conferred by consent, waiver, or estoppel." Syllabus point 5, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

2. "The Uniform Child Custody Jurisdiction and Enforcement Act, West Virginia Code § 48–20–101, *et seq.*, is a jurisdictional statute, and the requirements of the statute must be met for a court to have the power to adjudicate child custody disputes." Syllabus point 6, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

3. "Pursuant to West Virginia Code § 48–20–102(g) (2001), 'home state' means the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period." Syllabus point 3, *Rosen v. Rosen*, 222 W. Va. 402, 664 S.E.2d 743 (2008).

4.      One of the requirements under West Virginia Code § 48-20-201(a)(2) (2001), for a circuit court to obtain subject matter jurisdiction of a child whose home state is not West Virginia, is that a "court" of the home state of the child must decline to exercise jurisdiction. This requirement is not satisfied by evidence that some other person or entity in the child's home state declined jurisdiction.

**Hutchison, Justice**:

This appeal was brought by A.B.-C. (hereinafter "Petitioner") from the May 31, 2018, order of the Circuit Court of Mercer County that terminated her parental rights to her infant son, J.C.[1]  The controlling issue on appeal is whether the circuit court had subject matter jurisdiction to terminate Petitioner's parental rights.  Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we reverse and remand.

## I.

## FACTUAL AND PROCEDURAL HISTORY

During the early evening hours of August 25, 2017, the Petitioner was observed walking around for about an hour, with her son J.C., near an Advanced Auto store in Princeton, West Virginia.[2]  An employee at the store contacted the local police to investigate Petitioner's behavior.  After the police arrived they contacted the Respondent, West Virginia Department of Health and Human Resources (hereinafter "DHHR"), and requested a child protective service worker be dispatched to investigate the child's safety.

---

[1]Consistent with our long-standing practice in cases involving sensitive facts, we use the initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 256 n.1, 773 S.E.2d 20, 22 n.1 (2015).

[2] J.C. was approximately five months old at the time.

1

At around 8:30 p.m. a DHHR child protective service worker arrived at the store.[3] During its investigation, DHHR learned that the Petitioner was from Richlands, Virginia. The Petitioner informed DHHR that she was hitchhiking her way to Taylorsville, North Carolina, where she hoped to live with a relative and find work.[4] DHHR learned that the Petitioner was married to a man named O.C., an alleged illegal immigrant from Mexico, who resided in Richlands. It was also reported to DHHR that Petitioner left home because of a domestic dispute she had with O.C. and her mother.

At some point during the questioning by DHHR, Petitioner was taken to the Princeton police station to continue the investigation. DHHR was able to contact O.C. by phone. O.C. indicated that he did not have a vehicle, but that he would try to find a way to come to Princeton. O.C. was able to get the Petitioner's uncle to drive him to the police station in Princeton. Upon his arrival, O.C. informed DHHR that Petitioner had mental health issues and needed to go to a hospital. DHHR was able to learn from O.C. that Virginia authorities had previously provided child protective services to O.C. and

---

[3]For the sake of consistency, DHHR will be used with reference to the investigation by its child protective service worker.

[4]The Petitioner stated that she left Richlands on August 24, 2017, and was able to hitchhike as far as Bluefield, West Virginia. It appears that while she was in Bluefield an organization called Bluefield Union Mission provided hotel accommodations for the Petitioner for one night. The next day the Petitioner was able to get a ride from Bluefield to Princeton.

2

Petitioner.[5]  DHHR contacted child protective services in Virginia, but was informed that information regarding Petitioner and O.C. could not be disclosed.  DHHR was told by Virginia child protective services that any family incident occurring in West Virginia had to be handled in West Virginia by DHHR.

At the conclusion of the interview with Petitioner and O.C., DHHR decided not to release J.C. to his parents.  Instead, DHHR filed an application for temporary emergency custody with the Magistrate Court of Mercer County.  The reasons for taking custody of J.C. were set out in the application as follows:

> Mother stated that she was leaving Richlands to go to NC, but was found in Princeton, WV with no ride or place to stay with the baby.  Mother told different stories, but one was that she left because of a domestic between the child's father & her mother.  No protective caregiver.

After DHHR took custody of J.C., the Petitioner and O.C. left West Virginia.[6]

On August 28, 2017, DHHR filed a child abuse and neglect petition against the Petitioner and O.C.  The basis for the petition was DHHR's concerns about Petitioner's

---

[5]The Petitioner informed DHHR that Virginia child protective services had ended because she and O.C. complied with the conditions that had been imposed. Three of those conditions were that the family obtain housing, O.C. obtain employment, and that O.C. not consume alcohol around the child.

[6]It is appears that the Petitioner went to North Carolina and O.C. returned to Virginia.

mental health and ability to care for J.C., a prior child protective service involvement in Virginia, and O.C.'s alleged alcohol use and his failure to protect J.C.

On September 11, 2017, the circuit court held a preliminary hearing to determine whether there was probable cause that J.C. was abused or neglected and in imminent danger. The Petitioner and O.C. were at the hearing but did not testify.[7] DHHR informed the circuit court that a family member of the Petitioner, an aunt named T.C., was given temporary custody of J.C. by the state of Virginia, but that the custody order had expired.[8] T.C. was also designated as the payee for social security benefits that Petitioner received. DHHR also informed the court that T.C. and other family members were trying to have the Petitioner committed to a group home because of her mental health issues. The court was further informed that when the Petitioner reached North Carolina, after J.C. was taken from her, she lived in a shelter for several days before she was permitted to stay at the home of one of her cousins. At the conclusion of the preliminary hearing, the circuit court found probable cause for the abuse and neglect petition to proceed to an adjudicatory hearing.

---

[7]Before the hearing started, counsel for Petitioner informed the circuit court that the case needed to be referred to Virginia for resolution. At the conclusion of the hearing the circuit court instructed the assistant prosecutor to contact the attorney for the county in Virginia where the Petitioner had lived, to determine if any court proceeding was pending there.

[8]DHHR put on evidence from two of its child protective services workers.

4

On October 2, 2017, an adjudicatory hearing was held. Neither the Petitioner nor O.C. appeared at the hearing.[9] No witnesses were called at the hearing. Instead, the circuit court incorporated the evidence taken at the preliminary hearing. Based upon the preliminary hearing evidence, the circuit court found that the child was neglected. Further, the court held that because of the failure of Petitioner and O.C. to attend the hearing, the child was deemed abandoned as an aggravating factor.[10]

A dispositional hearing was held on January 8, 2018. The Petitioner appeared at the hearing, but O.C. did not.[11] No witness testimony was taken during the hearing. However, the circuit court was informed that arrangements had been made for Petitioner to have a psychological evaluation. It was also revealed that efforts were being made to place J.C. with a relative in North Carolina if parental rights were terminated. The court was also informed that Petitioner was pregnant. Petitioner's counsel requested an improvement period. The circuit court held that it would only consider an improvement period for Petitioner if she "consent[ed] to jurisdiction for the child she's carrying right

---

[9]The circuit court was informed that Petitioner and O.C. had problems getting transportation to West Virginia. The circuit indicated that it would "order the Department transport mom and dad to visits and MDTs and to the hearings."

[10]The circuit court also denied a previously filed motion by Petitioner to dismiss for lack of subject matter jurisdiction.

[11]At the time of the hearing Petitioner was living in Virginia once again.

now." At the request of counsel for O.C., the circuit court continued the dispositional hearing so that arrangements could be made for O.C. to be present.

On April 9, 2018, the dispositional hearing reconvened. However, neither the Petitioner nor O.C. appeared at the hearing. The circuit court was informed by Petitioner's counsel that the Petitioner called counsel on the morning of the hearing and informed him that she had given birth to a child in North Carolina.[12] The court was also informed that North Carolina's child protective services had taken the newborn into custody. DHHR and the Guardian ad Litem informed the court that efforts were being made to try and have J.C. turned over to family members in North Carolina. The circuit court continued the hearing to give DHHR an opportunity to try and arrange for placement of J.C. with family members in North Carolina.[13]

The dispositional hearing reconvened again on April 23, 2018. Neither the Petitioner nor O.C. appeared at the hearing. Counsel for Petitioner informed the circuit court that an active child protective services case was pending in a court in North Carolina, regarding the child Petitioner gave birth to in that state.[14] Petitioner's counsel requested the circuit court contact the North Carolina court to discuss relinquishing jurisdiction of

---

[12]The Petitioner had returned to North Carolina in February of 2018.

[13]J.C. was placed in an adoptive foster family in Mercer County on or about April 19, 2018.

[14]The circuit court was also informed that North Carolina's child protective services had arranged for the Petitioner to have a psychological evaluation.

the West Virginia case to the court in North Carolina. DHHR informed the circuit court that North Carolina's child protective services believed that it should retain jurisdiction of the child born there, and that the circuit court should keep jurisdiction of J.C. The circuit court ruled that it would try to contact the North Carolina judge to determine whether that judge wanted to take jurisdiction over J.C. The hearing was continued until May 21, 2018.

On May 21, 2018, the dispositional hearing once again reconvened. The Petitioner and O.C. did not appear at the hearing.[15] At the outset of the hearing the circuit court informed the attorneys in the case that he called the North Carolina judge on at least five occasions in May, in an attempt to discuss the case. However, the circuit court was never able to speak directly with the North Carolina judge. Petitioner's counsel informed the circuit court that the attorney representing Petitioner in the child custody proceeding in North Carolina, informed him that the North Carolina judge believed the case should be transferred to North Carolina.[16] Petitioner's counsel also informed the circuit court that the North Carolina judge needed to have an order that authorized the circuit court to speak with the North Carolina judge. The circuit court stated that it would not write such an

---

[15]At the time of the hearing it appears that O.C. had left the country and went to Honduras.

[16]The circuit court was also informed that the foster family in North Carolina that had custody of Petitioner's second child would like to adopt J.C.

7

order.[17]  After hearing testimony from a witness called by DHHR, the circuit ruled that it

was terminating the parental rights of Petitioner and O.C.[18]  A subsequent order was entered

terminating parental rights on May 31, 2018.  Petitioner thereafter filed this appeal.[19]

## II.

### STANDARD OF REVIEW

We apply the following standard of review to dispositional determinations

made by the circuit court in abuse and neglect cases:

> Although conclusions of law reached by a circuit court are subject to *de novo*
> review, when an action, such as an abuse and neglect case, is tried upon the
> facts without a jury, the circuit court shall make a determination based upon
> the evidence and shall make findings of fact and conclusions of law as to
> whether such child is abused or neglected.  These findings shall not be set
> aside by a reviewing court unless clearly erroneous.  A finding is clearly
> erroneous when, although there is evidence to support the finding, the
> reviewing court on the entire evidence is left with the definite and firm
> conviction that a mistake has been committed.  However, a reviewing court
> may not overturn a finding simply because it would have decided the case
> differently, and it must affirm a finding if the circuit court's account of the
> evidence is plausible in light of the record viewed in its entirety.

---

[17]The circuit court noted that, "[t]hat is the craziest damn thing I've heard … in 40 years of practicing law."

[18] DHHR's witness put on testimony that basically provided a procedural history of the case to the court.  There was testimony that the circuit court did not order Petitioner and O.C. to do anything to help regain custody of J.C.  The circuit court was informed that during a multidisciplinary team meeting it was suggested that Petitioner and O.C. undergo psychological evaluations in Princeton, but that they both failed to appear for their appointment.  There was also testimony that no family case plan was prepared because no improvement period was granted. DHHR informed the court that J.C. was regularly transported to Petitioner and O.C. for visitation.

[19] No appeal was filed by O.C.

Syl. pt. 1, *In re Tiffany Marie S*., 196 W. Va. 223, 470 S.E.2d 177 (1996).  Further, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).  In view of these standards we address the issues presented.

## III.
## DISCUSSION

The Petitioner contends that the circuit court lacked subject matter jurisdiction over the abuse and neglect proceeding, and therefore could not terminate her parental rights.[20]  In support of this argument, the Petitioner points out that she and J.C. are from Virginia and that they did not live in West Virginia for the time period required under the Uniform Child Custody Jurisdiction and Enforcement Act, codified at W. Va. Code § 48-20-101, *et seq*. (2001) (hereinafter "UCCJEA").[21]  DHHR and the Guardian ad Litem take the position that the circuit court had subject matter jurisdiction.

---

[20]It was previously noted that DHHR filed an emergency custody petition on August 25.  The Petitioner has not contested custody of J.C. under the emergency petition. *See* W. Va. Code § 48-20-204(a) ("A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.").

[21]Prior to 2001, the UCCJEA was called the Uniform Child Custody Jurisdiction Act and was codified at W. Va. Code § 48-10-1 (1981), *et seq*. We have previously noted that the UCCJEA "changed the prior Act to afford jurisdictional priority to the 'home state' in order to eliminate jurisdictional competition between courts

We note at the outset that, for purposes of the UCCJEA, an abuse and neglect proceeding comes under its definition of a "child custody proceeding."[22] We have previously recognized that "[s]ubject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, West Virginia Code § 48–20–101, *et seq.*, cannot be conferred by consent, waiver, or estoppel." Syl. pt. 5, *Rosen*. The decision in *Rosen* also held that "[t]he Uniform Child Custody Jurisdiction and Enforcement Act, West Virginia Code § 48–20–101, *et seq.*, is a jurisdictional statute, and the requirements of the statute must be met for a court to have the power to adjudicate child custody disputes." Syl. pt. 6, *Rosen*.

The requirements for subject matter jurisdiction under the UCCJEA are set out under W. Va. Code § 48-20-201(a).[23] This statute provides as follows:

> (a) Except as otherwise provided in section 20-204, a court of this state has jurisdiction to make an initial child custody determination only if:

---

regarding child custody." *Rosen v. Rosen*, 222 W. Va. 402, 406–07, 664 S.E.2d 743, 747–48 (2008).

[22]*See* W. Va. Code § 48-20-102(d) ("'Child custody proceeding' means a proceeding in which legal custody, physical custody or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights and protection from domestic violence in which the issue may appear. The term does not include a proceeding involving juvenile delinquency, contractual emancipation or enforcement under part 20-301, et seq.").

[23]*See* W.Va. Code § 48–20–201(b) ("Subsection (a) of this section is the exclusive jurisdictional basis for making a child custody determination by a court of this State.").

10

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) A court of another state does not have jurisdiction under subdivision (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 20-207 or 20-208, and:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships;

(3) All courts having jurisdiction under subdivision (1) or (2) of this subdivision have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under section 20-207 or 20-208; or

(4) No court of any other state would have jurisdiction under the criteria specified in subdivision (1), (2) or (3) of this subsection.

In the case *In re K.R.*, 229 W. Va. 733, 735 S.E.2d 882 (2012) we summarized the requirements of W. Va. Code § 48-20-201(a) as follows:

> to exercise jurisdiction to determine child custody, a court of this state must satisfy one of the four bases of jurisdiction set forth in Section 201(a). These four bases have been aptly summarized as 1) "home state" jurisdiction; 2) "significant connection" jurisdiction; 3) "jurisdiction because of declination of jurisdiction"; and 4) "default" jurisdiction. These jurisdictional bases do not operate alternatively to each other, but rather, in order of priority— reaching the next basis of jurisdiction only if the preceding basis does not resolve the jurisdictional issue.

*In re K.R.*, 229 W. Va. at 740, 735 S.E.2d at 889 (internal citation omitted). We will examine each of the factors set out under the statute.

**1. Home State Jurisdiction**

Pursuant to W. Va. Code § 48-20-201(a)(1), a circuit court has subject matter jurisdiction under the UCCJEA if West Virginia is the "home state" of the child when an abuse and neglect petition was filed. We set out the definition of home state in syllabus point 3 of *Rosen* as follows:

> Pursuant to West Virginia Code § 48–20–102(g) (2001), "home state" means the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. *In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned.* A period of temporary absence of any of the mentioned persons is part of the period. (Emphasis added.)

Relevant to the issue in this case is the observation in *Rosen* that, if a child custody proceeding commences when a child is less than six months old, W.Va. Code § 48–20–102(g) defines home state as the state in which the child lived from birth. *See A.M. v. Houston Cty. Dep't of Human Res*., 262 So. 3d 1210, 1217 (Ala. Civ. App. 2017) ("Because the child was less than six months old on the date of the commencement of the dependency proceeding, the child's 'home state' is defined as 'the state in which the child lived from birth' with a parent or a person acting as a parent."); *In Interest of Arnold*, 532 S.W.3d 712, 717 (Mo. Ct. App. 2017) ("Because Baby Girl Arnold was less than six months of age when the original petition was filed in this case, her home state was the state in which she lived from birth with a parent or a person acting as a parent."); *Jamilah DD. v. Edwin EE*., 59 N.Y.S.3d 193, 194 (N.Y. App. Div. 2017) ("Where, as here, the child is less than six months old, the home state is 'the state in which the child lived from birth' with a parent

12

or a person acting as a parent."); *Ocegueda v. Perreira*, 232 Cal. App. 4th 1079, 1085, 181 Cal. Rptr. 3d 845, 849 (2015) ("Thus, according to the plain language of the statute, the period for determining the home state of a child who is less than six months of age starts with the child's birth.").

J.C. was born in Virginia on March 17, 2017. The record shows that J.C. lived in Virginia from the date of his birth until on or about August 25, when Petitioner brought him to West Virginia while en route to North Carolina.[24] Therefore, when J.C. was brought to West Virginia he was less than six months old. At the time the abuse and neglect petition was filed on August 28, 2017, J.C. had been in West Virginia for only three days. It is clear from these undisputed facts that Virginia was the home state of J.C. when the abuse and neglect petition was filed.[25] *See Ex parte M.M.T.*, 148 So. 3d 728, 733 (Ala.

---

[24]It appears that immediately after J.C. was born he lived in Virginia briefly with an aunt, as a result of intervention by Virginia's child protective services. Thereafter, he lived with Petitioner and O.C.

[25]It was previously noted that at the preliminary hearing and adjudicatory hearing the Petitioner argued that Virginia was the home state. However, by the time the dispositional hearing took place, the Petitioner had relocated to North Carolina and gave birth to another child in that state. Consequently, at the dispositional hearing Petitioner argued that North Carolina was the home state. We need not resolve the issue of North Carolina being the home state because of our determination that Virginia was the home state. *See In re B.Q.S.*, 2014 WL 2957451, at *5 (Tex. App. June 26, 2014) (observing that "'home state' jurisdiction must be determined based on the circumstances that existed on the date the suit was commenced."); *In re A.M.*, 224 Cal. App. 4th 593, 598, 168 Cal. Rptr. 3d 494, 498 (2014) ("Subject matter jurisdiction either exists or does not exist at the time the action is commenced[.]").

Civ. App. 2014) ("It is undisputed that immediately before the commencement of the child-custody proceeding …, the child was less than six months old and Colorado was the state in which the child had lived from birth with the mother and the father. The child's presence in Alabama for less than one week before the father initiated the underlying action merely constituted a 'period of temporary absence' from Colorado. Colorado is clearly the child's home state.").

In view of our conclusion that Virginia was J.C.'s home state when the abuse and neglect petition was filed, it is clear that the circuit court could not rely upon W. Va. Code § 48-20-201(a)(1) as a basis for subject matter jurisdiction.

**2. Significant Connection Jurisdiction**

Even though West Virginia was not J.C.'s home state at the time the abuse and neglect proceeding was commenced, the circuit court could nevertheless have subject matter jurisdiction if the requirements of W. Va. Code § 48-20-201(a)(2) were satisfied. As previously noted, this provision states the following:

> A court of another state does not have jurisdiction under subdivision (1) of this subsection, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section 20-207 or 20-208 and:
> (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
> (B) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

14

Under this provision of the statute subject matter jurisdiction may be obtained in one of two ways. First, jurisdiction may be obtained if no other state has jurisdiction. We have already determined that Virginia was the home state under W. Va. Code § 48-20-201(a)(1). Therefore, this method of obtaining subject matter jurisdiction could not be relied upon by the circuit court in this proceeding.

The second way in which W. Va. Code § 48-20-201(a)(2) permitted the circuit court to obtain subject matter jurisdiction, is if (1) a court in Virginia declined to exercise jurisdiction, (2) J.C. and at least one parent had a significant connection with West Virginia, other than mere physical presence; and (3) substantial evidence was available in West Virginia regarding J.C.'s care, protection, training and personal relationships. *See G.P. v. L.M*, 2016 WL 7015895, at \*6 (Ohio Nov. 17, 2016) (applying these factors and concluding that "Hawai'i declined jurisdiction of the custody dispute and as the trial court stated, if Ohio did not assume jurisdiction, the family would be in 'no man's land.'"). As to the first criteria, the record in this case does not disclose that a "court" in Virginia was contacted and declined to exercise jurisdiction.[26] DHHR and the Guardian ad Litem point out that the child protective services in Virginia was contacted, and that it declined to get involved with the case. Consequently, DHHR and the Guardian ad Litem take the position

---

[26]*See* W.Va. Code § 48-20-110(a) (2001) ("A court of this state may communicate with a court in another state concerning a proceeding arising under this chapter.").

15

that Virginia declined jurisdiction through its child protective services agency. The problem with this argument is that the statute expressly required a "court" of Virginia decline jurisdiction, not a Virginia child protective services agency. DHHR and the Guardian ad Litem are asking this Court to add language to the statute that does not exist. However, we have held that "[i]t is not for this Court arbitrarily to read into a statute that which it does not say." Syl. pt. 11, in part, *Brooke B. v. Ray*, 230 W. Va. 355, 738 S.E.2d 21, 24 (2013). Our law is clear in holding that "[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. pt. 2, *Crockett v. Andrews*, 153 W. Va. 714, 172 S.E.2d 384 (1970). The relevant language in W. Va. Code § 48-20-201(a)(2) is clear and unambiguous in requiring a "court" of the child's home state decline jurisdiction. *See In re S.R.*, No. 16-1139, 2017 WL 2628565, at *3 (W. Va. June 19, 2017) (Memorandum Decision) ("Moreover, the circuit court contacted the Ohio Court of Common Pleas and that court declined to exercise jurisdiction in this matter. Therefore, as established by the record, the circuit court satisfied all of the statutory requirements … and was in full compliance with the UCCJ[E]A."). Consequently, we now hold that, one of the requirements under West Virginia Code § 48-20-201(a)(2) (2001), for a circuit court to obtain subject matter jurisdiction of a child whose home state is not West Virginia, is that a "court" of the home state of the child must decline to exercise jurisdiction. This requirement is not satisfied by evidence that some other person or entity in the child's home state declined jurisdiction.

16

Our holding on this issue is consistent with the ruling in *In re Joseph B.*, 2014 WL 5409006 (Cal. Ct. App. Oct. 24, 2014) (unpublished). The decision in *Joseph B.* addressed the issue of contacting a court of the home state of a child as required under California's UCCJEA.[27] In that case the mother, J.M., gave birth to a son, J.B., in February of 2012 in Las Vegas, Nevada. In late December of 2012, J.M. moved to California with J.B. to live with a cousin. In January of 2013, California's child protective services removed J.B. from J.M.'s custody because she was experiencing mental health issues— including having thoughts of harming J.B. During the initial hearing in the case, the trial court was informed that California's UCCJEA was triggered because the child had only been in the state for a few weeks. At some point the court contacted a law clerk of a court in Nevada and was informed that there was no active case involving the child in Nevada. Based upon contact with the law clerk in Nevada, the California trial court found that it had subject matter jurisdiction under the UCCJEA. The court ultimately determined that J.B. would be placed with his father in Texas. J.M. appealed the dispositional order, and alleged on appeal that the trial court did not have subject matter jurisdiction because no court in Nevada declined to exercise jurisdiction. The appellate court agreed as follows:

> In California, the UCCJEA is the exclusive means of determining subject matter jurisdiction in a custody dispute involving another jurisdiction.
> \*\*\*
> In our view, however, the record unquestionably establishes Nevada as the home state. [J.B.] lived there from his birth in February 2012 until late December 2012....

---

[27]California's UCCJEA is similar to West Virginia's statute.

17

. . . .

> We conclude the court violated the UCCJEA by making orders of a permanent nature without contacting Nevada authorities to inquire whether that state wished to assert its home state jurisdiction and commence a proceeding to protect [J.B.'s] interests. The court's contact with a law clerk at a court in Nevada was insufficient to satisfy its duty.

*In re Joseph B*., at *4-6. *See Rust v. Rust*, 2018 WL 4760157, at *5 (Tex. App. Oct. 3, 2018) ("The only other basis upon which the trial court could acquire jurisdiction over the custody suit is if the North Carolina court declined jurisdiction on the ground that Texas is a more appropriate forum. However, the record contains no pleadings or proof to support such a conclusion."); *G.S. v. R.L.*, 259 So. 3d 677, 681 (Ala. Civ. App. 2018) ("The record in these cases does not contain any order from any Tennessee court declining to exercise its home-state jurisdiction over the children[.]"); *In re E.R.*, 28 Cal. App. 5th 74, 80, 238 Cal. Rptr. 3d 871, 876 (2018) ("California court obtained jurisdiction on July 19, 2017, the date the Nevada court declined to exercise jurisdiction."); *In Interest of A.R.*, 902 N.W.2d 593 (Iowa Ct. App. 2017) ("The Nebraska court … declined jurisdiction on the ground it determined Iowa is a more appropriate forum in accordance with the UCCJEA."); *Sergeant v. DeRung*, 213 So. 3d 423, 7–427 (La. App. 2016) ("given that there is no indication that the Minnesota court has declined jurisdiction over the issue of the child's …, it is clear that the district court here does not have subject matter jurisdiction[.]"); *S.C. Dep't of Soc. Servs. v. Johnnie B.*, 2014 WL 2579937, at *2 (S.C. Ct. App. Feb. 21, 2014) ("Because the Georgia superior court did not decline jurisdiction, South Carolina did not have jurisdiction to issue an initial child custody determination.").

18

Insofar as the record in the instant case clearly shows that no court in Virginia declined to exercise jurisdiction in this matter, we need not address the remaining two requirements of W. Va. Code § 48-20-201(a)(2). Failure to obtain a waiver of jurisdiction by Virginia is sufficient to find that the circuit court did not have subject matter jurisdiction under W. Va. Code § 48-20-201(a)(2).

**3. Declination of Jurisdiction and Default Jurisdiction**

Pursuant to W. Va. Code § 48-20-201(a)(3) the circuit court could obtain subject matter jurisdiction in this matter if a Virginia court declined to exercise jurisdiction. We have already determined that no court in Virginia declined to exercise jurisdiction, therefore the circuit court did not have subject matter jurisdiction under W. Va. Code § 48-20-201(a)(3).

The default jurisdiction provision contained in W. Va. Code § 48-20-201(a)(4) would allow the circuit court to obtain subject matter jurisdiction if no court of any other state had jurisdiction. Insofar as we have determined that Virginia was the home state of J.C., this provision could not be relied upon by the circuit court. *See Wolter v. Fortuna*, 27 Neb. App. 166, 177, 2019 WL 1907328 (2019) (finding no other court had jurisdiction therefore "Nebraska has 'last resort' jurisdiction").

19

In sum, there was no evidence in the record to show that any of the subject matter requirements of W. Va. Code § 48-20-201(a) were satisfied.[28] Consequently, the circuit court lacked subject matter jurisdiction.[29]

[28]During oral argument the Guardian ad litem suggested that the termination of Petitioner's parental rights could be upheld under the temporary emergency jurisdiction statute, W. Va. Code § 48-20-204. We disagree. Courts addressing temporary emergency jurisdiction, under their version of the UCCJEA, have found that the power of a court under this provision is limited. It has been held that "[b]y its very nature, temporary emergency jurisdiction exists only for a limited period." *Beauregard v. White*, 972 A.2d 619, 626 (R.I. 2009). It has also been recognized that the "exercise of temporary emergency jurisdiction may not last until the trial court can enter an adjudicatory order finding a child dependent and neglected." *In re State ex rel. M.C.*, 94 P.3d 1220, 1225 (Colo. App. 2004). *See In re Brode*, 566 S.E.2d 858, 860 (N.C. Ct. App. 2002) ("When a court invokes emergency jurisdiction, any orders entered shall be temporary protective orders only."); *Saavedra v. Schmidt*, 96 S.W.3d 533, 549 (Tex. App. 2002) ("A court's exercise of temporary emergency jurisdiction is temporary in nature and may not be used as a vehicle to attain modification jurisdiction for an ongoing, indefinite period of time."). Under the facts of the instant case, the circuit court's temporary emergency jurisdiction ended when DHHR filed the abuse and neglect petition. *See WP v. MS*, 141 Haw. 246, 407 P.3d 1282 (Ct. App. 2017) ("Temporary emergency jurisdiction under the UCCJEA is temporary and limited and does not include the authority to make permanent custody determinations."); *In re Gino C.*, 224 Cal. App. 4th 959, 965–66, 169 Cal. Rptr. 3d 193, 197 (2014) ("temporary emergency jurisdiction does not confer authority to make a permanent child custody determination."); *In re N.R.*, 2009 WL 1508568, at *14 (Neb. Ct. App. May 26, 2009) ("we conclude that while the juvenile court had temporary emergency jurisdiction with regard to Ay.R., the juvenile court erred when it terminated Rony's and Jessica's parental rights to Ay.R. without satisfying the requirements of the UCCJEA.").

[29]Petitioner also assigned error to the circuit court's (1) failure to decline jurisdiction, and (2) its determination that J.C. was abandoned. Because of our resolution of the subject matter jurisdiction issue, we need not address Petitioner's remaining two assignments of error. However, we will note in passing that the abandonment finding was problematic for several reasons, including the fact that it was not properly part of the proceeding without an amendment to the abuse and neglect petition. *See In re L.C.*, No. 18-0777, 2019 WL 181501, at *2 (W. Va. Jan. 14, 2019) (Memorandum Decision) ("the DHHR did not amend the petition to include allegations of substance abuse. As such, petitioner's substance abuse did not form a basis for adjudication."); *In re B.A.*, No. 15-0700, 2015 WL 7628728, at *3 (W. Va. Nov. 23, 2015) (Memorandum Decision) ("When

**IV.**

**CONCLUSION**

In view of the foregoing, we conclude that the circuit court did not have subject matter jurisdiction in this proceeding. Therefore its May 31, 2018, order terminating the parental rights of Petitioner is void and unenforceable.[30] *See Jackson v. Pszczolkowski*, 2018 WL 5099642, at *2 (W. Va. Oct. 19, 2018) (Memorandum Decision) ("Without subject matter jurisdiction, any ruling issued by the circuit court would have been void."); *State ex rel. TermNet Merch. Servs., Inc. v. Jordan*, 217 W. Va. 696, 700, 619 S.E.2d 209, 213 (2005) ("The urgency of addressing problems regarding subject-matter jurisdiction cannot be understated because any decree made by a court lacking jurisdiction is void."); Syl. pt. 5, in part, *State ex rel. Hammond v. Worrell*, 144 W.Va. 83, 106 S.E.2d 521 (1958), *overruled on other grounds by Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981) ("A decree entered in a pending suit in which the court lacks jurisdiction of the subject-matter is to that extent void[.]").

---

the evidence indicated that petitioner likely abandoned that child, the circuit court correctly allowed the DHHR to amend the petition a second time to include allegations of petitioner's abandonment. The circuit court also appropriately reopened the adjudicatory hearing in January of 2015 to allow the DHHR to prove the allegations and afford petitioner an opportunity to defend against the same.").

[30]Our ruling necessarily extends to the termination of O.C.'s parental rights, even though he was not a party to this appeal.

21

Our conclusion that the circuit court did not have subject matter jurisdiction to resolve the abuse and neglect petition does not end the matter. The record in this case is sufficient for this Court to conclude that it is not in the best interest of J.C. to simply return him to the Petitioner without any supervision, due to Petitioner's mental health issues.[31] Therefore, on remand the circuit court is instructed to contact the appropriate court in Virginia to ascertain whether that court is willing to exercise jurisdiction over J.C. If the Virginia court is willing to take jurisdiction, then J.C. should be transferred to Virginia as provided by law.

If Virginia declines jurisdiction, then we summarily find that under the facts of this case the circuit court would have subject matter jurisdiction under W. Va. Code § 48-20-201(a)(2). In the event the circuit court obtains jurisdiction because Virginia declines jurisdiction, we do not believe that West Virginia is a convenient forum.[32] The Petitioner's reply brief indicated that J.C.'s sibling is with a foster family in North Carolina.

---

[31]*See W. Virginia Dep't of Human Servs. v. La Rea Ann C.L.*, 175 W. Va. 330, 336, 332 S.E.2d 632, 637 (1985) ("We have repeatedly held that in contests involving the custody of infants the welfare of the child is of paramount and controlling importance and is the 'polar star' by which the discretion of the court will be guided.").

[32]*See* W. Va. Code § 48-20-207(a) ("A court of this state which has jurisdiction under this chapter to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon the motion of a party, the court's own motion or request of another court.").

22

The Petitioner also informed this Court that if J.C. is not returned to her, the North Carolina foster family would be interested in adopting him. We believe that it is in the best interest of J.C. to be united with his sibling in North Carolina.[33] Consequently, if Virginia declines jurisdiction the circuit court is authorized by this opinion to contact the appropriate court in North Carolina and attempt to have that court take custody of J.C. for a disposition that is consistent with that of his sibling.[34]

Finally, if the court in North Carolina declines to take jurisdiction over J.C., the circuit court must hold a de novo adjudicatory and dispositional hearing to determine whether J.C. was abused or neglected at the time the petition was filed.

Reversed and Remanded.

---

[33]During oral argument this Court was informed that arrangements have been made to allow the siblings to visit with each other.

[34]We understand the problems the circuit court encountered when it previously attempted to contact a court in North Carolina. We have worded the remand instructions in such a manner as to inform the court in North Carolina that the circuit court is authorized to communicate with it.